# IN THE SUPREME COURT, STATE OF WYOMING

## 2014 WY 152

OCTOBER TERM, A.D. 2014

*December 2, 2014*

LP,

**Appellant**
**(Respondent),**

v.                                                           S-14-0066

LF,

**Appellee**
**(Petitioner).**

*Appeal from the District Court of Laramie County*
*The Honorable Thomas T.C. Campbell, Judge*

*Representing Appellant:*
　　Dona Playton, Interim Faculty Director; Danielle R. Cover, Faculty Supervisor; Brianne Phillips, Student Director; Michael J. Fitzgerald, Student Intern; University of Wyoming Legal Services Program, Laramie, Wyoming. Argument by Ms. Phillips.

*Representing Appellee:*
　　No appearance

*Representing Amicus Curiae National Association of Social Workers and the National Association of Social Workers, Wyoming Chapter:*
　　Jessica Rutzick of Jessica Rutzick & Associates, P.C., Jackson, Wyoming

*Before BURKE, C.J., and HILL, KITE, DAVIS, and FOX, JJ.*

NOTICE: This opinion is subject to formal revision before publication in Pacific Reporter Third. Readers are requested to notify the Clerk of the Supreme Court, Supreme Court Building, Cheyenne, Wyoming 82002, of any typographical or other formal errors so that correction may be made before final publication in the permanent volume.

**DAVIS**, Justice.

[¶1]    Appellee LF sought a judgment determining that Appellant LP was not the biological father of KEP.  Appellant claimed to be KEP's actual and presumptive parent, and that Mother's lawsuit was untimely.  He also claims to be entitled to parental rights by virtue of de facto parentage or parentage by estoppel.  The district court granted Appellee's petition to establish that Appellant was not KEP's father, and Appellant challenged that determination in this appeal.  We affirm.

## ISSUES

[¶2]    Appellant presents a total of six issues, which we have distilled and rearranged.

        1.      Did the district court err in granting Appellee's petition to prove that Appellant was not KEP's biological father under the Wyoming Parentage Act?

        2.      Did the district court err in not finding that Appellant was a de facto parent, even if he was not KEP's biological parent?

        3.      Did the district court err in not finding that Appellant was a parent by estoppels, even if he was not KEP's biological parent?

## FACTS

[¶3]    The facts of this case are disputed, and its procedural history is confusing.[1]  LF (referred to as Mother because of the similarity of the parties' initials in this confidential case) is the mother of KEP, who is now ten years of age.  LP, the Appellant, met Mother in the Denver, Colorado area.

[¶4]    At a hearing dealing generally with this issue, Appellant testified that he had a sexual relationship with Mother during a time period when KEP could have been conceived.  Mother, on the other hand, testified that she was "five months pregnant and showing" with KEP when she met Appellant.  Genetic testing ultimately conducted and stipulated into evidence found that there was a 0.00% probability that Appellant is KEP's biological father.  The district court found as follows concerning the claim that Appellant had a relationship with Mother at a time when he could be the father:

---

[1] A number of law students participating in the University of Wyoming Legal Services Program have represented LP during these proceedings.  Rule 9 of the Rules Governing the Wyoming State Bar and the Authorized Practice of Law allows law students supervised by an attorney admitted to practice in Wyoming to appear in cases in Wyoming courts.  We mention this only to point out that the student attorney who argued this case to us did not participate in the district court proceedings or appear on the brief when it was filed.

1

> The Court finds, for instance, that [Appellant's] assertion in his answer that the parties had sexual contact at or about the time of conception, was wholly unsupported by the evidence, and quite the contrary it is clear their relationship, dating and ultimately cohabitating, did not cover the period when he would have had to have had sexual access to the mother. If he knew, as it turns out he did, that he could not have been the father, he should not have plead [sic] it in his answer.

[¶5]   It is undisputed, however, that Appellant was present when KEP was born, and that he is listed as the father on the child's birth certificate. The couple lived together when KEP was born. Neither party knew who filled out a worksheet that led to the issuance of the birth certificate. The parties agree that KEP was named after Appellant's twin brother and that he bears Appellant's last name, and Mother did not deny giving Appellant a ring inscribed with the word "Dad."

[¶6]   The parties disagree on the length of time that they lived together in the Denver area, however. Appellant estimates it at twenty-one or twenty-two months, while Mother estimates it at about eighteen months. They agree that they moved to Spokane with KEP after living in Denver. Appellant estimates that they all lived together in Spokane for one to two months, while Mother estimates the time period at a month. Appellant claims to have paid most if not all of their living expenses during this time because he was the only one working, while Mother denies that he was the sole financial provider.

[¶7]   After they had lived in Washington for a month or two, the couple decided to take a break from each other, which Appellant assumed would last for a couple of months. Mother left with the child for parts unknown, and did not communicate with him after she left. They never lived together after that separation.

[¶8]   Appellant attempted without success to locate Mother and KEP through law enforcement agencies for a time. Mother later explained that she and KEP had been in a safe house in Longmont, Colorado for a week, and that they were then transferred to a safe house in Cheyenne, where they remained until she rented an apartment there. The record offers no explanation as to why they were staying in a safe house, which was presumably a facility for women and children who were threatened with violence.

[¶9]   At some point, by means not identified in the record, Appellant and Mother made contact, and they and KEP met at the Cheyenne Walmart. Appellant bought things that KEP needed at that store. He then moved to Cheyenne and rented an apartment, and after four months moved to another apartment across the street from Mother. The child spent time with his mother and Appellant as he chose, although the record does not quantify how much time he spent with each.

[¶10] This situation continued for about five years. The parties once again disagree as to Appellant's contribution to KEP's support. He testified that he "supported" KEP, but did not explain what or how much support was provided. He testified that Mother contributed "very little" to the child's care. Mother testified, on the other hand, that Appellant "helped some, but not a lot" in paying KEP's expenses during this time frame.

[¶11] Mother filed a "Petition to Disprove Father-Child Relationship, or In the Alternative, Order Child Custody and Child Support" in Laramie County District Court on August 12, 2011. The impetus for this filing is unclear, although it may have had something to do with receipt of public assistance. In the petition Mother alleged that Appellant and Mother did not have a relationship when KEP was conceived, and that she was five months pregnant when she and Appellant began to live together. Appellant timely responded and counterclaimed, contending that he and Mother did have a sexual relationship at the time KEP was conceived. He asked the district court to determine that he was the child's biological father, and that it award him primary custody with appropriate visitation for Mother.

[¶12] Although the record does not contain a transcript of it, the district court held a hearing on March 6, 2012. On July 2, 2012, it entered an order finding that Appellant had not acknowledged paternity as provided for by Wyo. Stat. Ann. § 14-2-602, and that there was no presumption that he was KEP's father under Wyo. Stat. Ann. § §14-2-504(a)(v).[2] This finding is important because the statute of limitations for a proceeding to determine paternity when there is a presumptive father must be brought within a reasonable time but no later than five years after the child is born. Over five years had passed between the child's birth at the end 2003 and the filing of the petition to disprove paternity in 2011.

[¶13] However, a proceeding seeking to disprove paternity can be brought at any time if the putative father did not cohabitate or engage in sexual intercourse with the mother at the probable time of conception, or if the putative father did not openly hold the child out as his own. Wyo. Stat. Ann. § 14-2-807(a) and (b) (LexisNexis 2013).[3] Mother's

---

[2] "A man is presumed to be the father of a child if . . . (v) [f]or the first two years of the child's life, he resided in the same household with the child and openly held the child out as his own." Wyo. Stat. Ann. § 14-2-504(a)(v) (LexisNexis 2013).
[3] This statute states:

> (a) Except as otherwise provided in subsection (b) of this section, a proceeding brought by a presumed father, the mother, or another individual to adjudicate the parentage of a child having a presumed father shall be commenced within a reasonable time after obtaining knowledge of relevant facts, but in no event later than five (5) years after the child's birth.

petition would therefore be timely only if Appellant was not KEP's presumed father. The Court also ordered a paternity test under Wyo. Stat. Ann. § 14-2-702.[4]

[¶14] On August 4, 2012, Mother physically attacked Appellant in his apartment, and KEP unfortunately became involved in the affray. Appellant obtained a domestic violence protection order[5] under Wyo. Stat. Ann. § 35-21-101 *et seq.*, but left Cheyenne for Tekoa, Washington with KEP without consulting Mother or seeking court approval nonetheless. The paternity test results referred to above were filed on August 7, 2012. On October 10, 2012, Mother filed a motion seeking an order awarding her temporary custody of KEP and requiring Appellant to return the child to Wyoming immediately.

---

> (b) A proceeding seeking to disprove the father-child relationship between a child and the child's presumed father may be maintained at any time if the court determines that:
>
> (i) The presumed father and the mother of the child neither cohabited nor engaged in sexual intercourse with each other during the probable time of conception; and
>
> (ii) The presumed father never openly held out the child as his own.

Wyo. Stat. Ann. § 14-2-807. This statute might have barred Appellant's claim, but it was not raised by Mother.

[4] Section 14-2-702 provides in pertinent part as follows:

> (a) Except as otherwise provided in this article and article 8 of this act, the court shall order the child and other designated individuals to submit to genetic testing if the request for testing is supported by the sworn statement of a party to the proceeding:
>
> (i) Alleging paternity and stating facts establishing a reasonable probability of the requisite sexual contact between the individuals; or
>
> (ii) Denying paternity and stating facts establishing a possibility that sexual contact between the individuals, if any, did not result in the conception of the child.

Wyo. Stat. Ann. § 14-2-702 (LexisNexis 2013). The pleadings containing the required allegations are not sworn, and testimony leading to the order of July 2, 2012 is not in the record. However, as will be discussed more fully below, we presume that the district court had adequate evidence before it to order as it did in the absence of a record to the contrary. *Golden v. Guion*, 2013 WY 45, ¶¶ 4-5, 299 P.3d 95, 96-97 (Wyo. 2013).

[5] The order and application therefore were referred to in the record, but neither is actually part of it. The range of relationships which can permit an alleged victim to be classified as a "household member" for purposes of obtaining a protective order are quite broad, including "[p]ersons formerly living with each other" and "persons who . . . have been in a dating relationship." Wyo. Stat. Ann. § 35-21-102(a)(iv)(D) and (H) (LexisNexis 2013).

4

[¶15]  In an Amended Pretrial Memorandum[6] filed on January 23, 2013 in anticipation of a hearing on the merits, Appellant identified the issues to be determined as whether Mother and he had entered into a common law marriage in Colorado, whether he was the presumptive father under § 14-2-504 because he and Mother had lived together for two years after KEP's birth, and whether he should have custody if he was the presumptive father under the statute.  Appellant did not at that point claim that he was a parent by estoppel or a de facto parent under American Law Institute (ALI) *Principles of the Law of Family Dissolution* (*Principles*).

[¶16]  The district court held an evidentiary hearing to resolve any factual issues that same day.  At the hearing, Appellant's counsel stipulated to the accuracy and admissibility of the genetic test the district court had ordered, and it was received in evidence.  The parties testified as generally described above.  There were numerous conflicts in the testimony, as we have noted.  At no time during the hearing did Appellant claim that he was a parent by estoppel or a de facto parent under ALI *Principles*.  He argued instead that he had entered into a common law marriage with Mother in Colorado, or that alternatively the district court had the equitable power to shorten the two-year period required to become a presumptive parent under Wyo. Stat. Ann. § 14-2-504(a)(v).  The district court took the matter under advisement and gave the parties an opportunity to file additional briefs concerning equitable grounds for relief.

[¶17]  On February 6, 2013, Appellant filed a pleading entitled "Motion Pursuant to Rule 60(b)(5) [sic] Modify or Rescind Order Based on Principles of Equitable Estoppel," which it supported with a brief.  This pleading asked the district court not to enforce the order for genetic testing which had been entered almost seven months earlier, after the results had been received and entered into evidence at the January hearing.  For the first time we can find in this record, he referred to the ALI *Principles of the Law of Family Dissolution* in the brief supporting this motion, stating that:

> The doctrine of equitable estoppel and W.[R.C.P.] Rule 60(b)(5) provide the Court with the equitable power and authority to relieve the Respondent from the Order.  This proposed action allows the Court to reexamine issues that are silenced due to an order that is no longer equitable.  If the Court assumes its equitable authority it can consider alternative theories regarding the parental rights of the Respondent.  The Court may choose to recognize [LP] as a presumptive or acknowledged father or parent by estoppel

---

[6] The original pretrial memo filed by L.P., that filed by Mother, and the scheduling order for the proceeding to which they pertain are not in the record.  Based upon events at the hearing, and the order ultimately entered, we infer that the scheduling order set a hearing at which the merits of Mother's original petition to disprove L.P.'s paternity were to be determined, and we can see that the hearing was actually held because a transcript was included in the record.

and a de facto parent, or both in accordance with those definitions found in the *American Law Institute (ALI): Principles of the Law of Family Dissolution.*

[¶18]   However, Appellant argued that the district court (not Mother) should be estopped from enforcing the order because he earlier testified that he had held himself out to be the child's father since birth and had maintained a relationship with KEP.[7]  Neither the brief nor the motion contain any analysis of how the evidence supported a claim of parentage by estoppel or de facto parentage.

[¶19]   On June 4, 2013, Mother filed a renewed motion for an order awarding her custody and ordering Appellant to return KEP to Wyoming without delay.   In an amended response to that motion filed on June 27, 2013, five months after the hearing, Appellant for the first time quoted the ALI *Principles* on de facto parentage and parentage by estoppel.

[¶20]   On August 8, 2013, the court entered an order requiring Appellant to return KEP to Mother in Wyoming, but the order also indicated that the court planned to hold a hearing five days before school began in Washington State to determine whether the child would return to Appellant in Washington or remain with Mother in Wyoming after that date.  If that hearing was held, there is no transcript or order resulting from it in the record. On November 27, 2013, the district court entered a decision letter holding as follows:

- As the court had previously decided, Appellant was not the presumed parent of KEP under the Wyoming Parentage Act.  It noted that the paternity test in fact proved that he was not in fact KEP's biological parent.  It found his claim that he and Mother had a sexual relationship at a time when KEP could have been conceived to be wholly unsupported by the evidence.

- Appellant had hardly acted equitably himself in taking the child to Washington, but in any event there was no equitable basis to deviate from the statutory elements required to establish that he was presumed to be KEP's parent.

- The evidence of a common law marriage in Colorado was "woefully insufficient."

- Mother's petition to disprove Appellant's parentage was timely because he was not the presumed father.

---

[7] This is an unusual definition of estoppel, which generally prevents a party "from asserting a claim or right that contradicts what one has said or done before or what has been legally established as true." Black's Law Dictionary 667 (10th ed. 2014).

6

- Neither the parties nor the judge had been able to identify any proposition of law that would allow the court to declare a person to be KEP's father on equitable grounds.

- It was unnecessary to evaluate the best interests of the child, because Appellant was not KEP's biological father and he could not be awarded custody or visitation.

[¶21] An order granting Mother's petition to disprove Appellant's father-child relationship was entered on January 6, 2014. Although the Rule 60(b) motion was not expressly denied, the tenor of the order makes it clear that the relief was not granted. The ruling did not mention de facto parentage or parentage by estoppel; perhaps this was because those theories were presented late.

[¶22] This appeal was timely perfected. Mother did not appear or file a brief. We permitted the National Association of Social Workers and the Wyoming Chapter of that organization to file an amicus brief.

[¶23] On April 18, 2014, Appellant filed a motion asking this Court to take judicial notice of certain pleadings in Wyoming guardianship proceedings related to KEP. That motion was granted. One of the documents of which we took notice is a stipulated order appointing Appellant to be KEP's guardian. In it, the parties stipulated that Mother "is unable to provide the necessary care for KEP and has requested that [Appellant] take guardianship of the minor child in order that the minor child may relocate to Washington with the [Appellant] and attend school and reside there."[8]

## DISCUSSION

### *Statutory Presumption of Paternity*

[¶24] We address this issue first, because if Appellant is entitled to be adjudicated KEP's parent under existing law, we need not address the other theories he raises. We have recently summarized the standard of review applicable when a case has been tried to the district court:

> The factual findings of a judge are not entitled to the limited review afforded a jury verdict. While the findings are presumptively correct, the appellate court may examine all of the properly admissible evidence in the record. Due regard is given to the opportunity of the trial judge to assess the

---

[8] We agree with Appellant that the order awarding him guardianship does not render the issues in this case moot. A guardianship may be terminated when no longer necessary, and it is clearly not the equivalent of holding parental rights. Wyo. Stat. Ann. § 3-3-1101(v) (LexisNexis 2013).

7

credibility of the witnesses, and our review does not entail re-weighing disputed evidence. Findings of fact will not be set aside unless they are clearly erroneous. A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. In considering a trial court's factual findings, we assume that the evidence of the prevailing party below is true and give that party every reasonable inference that can fairly and reasonably be drawn from it. We do not substitute ourselves for the trial court as a finder of facts; instead, we defer to those findings unless they are unsupported by the record or erroneous as a matter of law. The district court's conclusions of law are reviewed *de novo*.

*Graybill v. Lampman*, 2014 WY 100, ¶ 25, 332 P.3d 511, 519 (Wyo. 2014) (quoting *Helm v. Clark,* 2010 WY 168, ¶ 6, 244 P.3d 1052, 1056 (Wyo. 2010)).

[¶25] In its November 27, 2013 decision letter, the district court indicated that it had determined that Appellant was not presumed to be KEP's biological father following a hearing on March 6, 2012, but that the order implementing the oral ruling of that date was not approved and entered until July 2, 2012. If the hearing that resulted in the order was reported, no transcript of it is in the record.

We have long held that appellants must provide this Court with a record sufficient to allow adequate appellate review. When no transcript or any other proper substitute record of the facts of a case is included in the record on appeal, we presume that there were no irregularities in the district court's judgment, and that it was reasonably based on competent and sufficient evidence. *Golden v. Guion*, 2013 WY 45, ¶¶ 4-5, 299 P.3d 95, 96-97 (Wyo. 2013); *Chancler v. Meredith*, 2004 WY 27, ¶ 5, 86 P.3d 841, 842 (Wyo. 2004); *Stadtfeld v. Stadtfeld*, 920 P.2d 662, 664 (Wyo. 1996).

*Roberts v. Locke*, 2013 WY 73, ¶ 27, 304 P.3d 116, 122 (Wyo. 2013).

[¶26] Appellant must therefore rely upon a W.R.C.P. 60(b)(5) motion which is somewhat difficult to understand, but appears to argue that the order requiring paternity testing and finding that he was not a presumed parent was "no longer equitable." As already noted, this motion was filed after paternity testing was completed, after the district court held an evidentiary hearing on the issues Appellant identified in his pretrial

8

memorandum, and after his counsel stipulated to the accuracy and admissibility of the paternity test at the evidentiary hearing.

> Review of a court's decision on a Rule 60(b) motion is confined to a determination of whether the court abused its discretion, and it is the movant's burden to bring his cause within the claimed grounds of relief and to substantiate these claims with adequate proof. We will reverse an order denying relief under Rule 60(b) only if the trial court clearly was wrong.

*Campbell v. Hein*, 2013 WY 131, ¶ 8, 311 P.3d 165, 167 (Wyo. 2013) (citation omitted).

[¶27] Appellant argues that he should be presumed to be KEP's father because he "substantially complied" with the statutory requirements of Wyo. Stat. Ann. § 14-2-504(a)(v). As noted in footnote 2, that statute provides as follows:

> (a)    A man is presumed to be the father of a child if:
>
> .   .   .
>
> (v) For the first two (2) years of the child's life, he resided in the same household with the child and openly held out the child as his own.

Wyo. Stat. Ann. § 14-2-504(a)(v).

[¶28] Appellant concedes that he and Mother lived together for only twenty-one months, which is of course less than two years, but argues that the district court should have overlooked the shortfall and presumed him to be KEP's parent. He argues that *Mak-M v. SM*, 854 P.2d 64, 68 (Wyo. 1993), requires only substantial compliance with the requirements of the Wyoming Parentage Act. *Mak-M* dealt with the rights of a presumed parent in a case in which the district court found that the mother of the child involved did not file her petition to disprove paternity "within a reasonable time." *Id.* at 66. It did not deal with the very specific period identified by the legislature.

[¶29] Appellant evidently hoped that a presumption of paternity would render Mother's petition to prove that he was not the father untimely. However, the statute only creates a presumption, which "imposes on the party against whom it is directed the burden of proving the nonexistence of the presumed fact is more probable than its existence." Wyoming Rule of Evidence 301. Appellant stipulated to the accuracy and admissibility of a paternity test which conclusively proved that he could not be KEP's biological father and which therefore rebutted the presumption beyond any doubt. We therefore affirm the

district court's implicit denial of that aspect of the Rule 60(b)(5) motion without further analysis.

**De Facto and Equitable Parentage**

[¶30]  Appellant points out that the traditional biologically-based definition of parentage is undergoing a transformation in other states.  Some jurisdictions have given parental rights to individuals who are not biological parents through application of the *in loco parentis* doctrine, as psychological parents, or as de facto parents or parents by estoppel.[9] For an overview, *see* Jeff Atkinson, *Shifts in the Law Regarding the Rights of Third Parties to Seek Visitation and Custody of Children*, 47 Fam. L.Q. 1 (2013).  Appellant's brief focuses on de facto parentage, although it also claims that he is a parent by estoppel under the ALI *Principles*.

[¶31]  The first issue we must address is whether Appellant preserved these issues for review.  We have held that we will not address issues which were not properly raised in the district court.  *Courtenay C. and Lucy Patten Davis Found. v. Colorado State Univ. Research Found.*, 2014 WY 32, ¶ 36, 320 P.3d 1115, 1126 (Wyo. 2014) (quoting *In re Guardianship of Lankford*, 2013 WY 65, ¶ 28, 301 P.3d 1092, 1101 (Wyo. 2013)). Appellant claims that he did raise them sufficiently in the Rule 60(b)(5) motion referred to above, and in the response to a renewed request for an order requiring him to return KEP to Wyoming.

[¶32]  The Rule 60(b)(5) motion contended that the ruling calling for a paternity test was "no longer equitable."  The order in question only determined that Appellant was not KEP's presumptive father and required genetic testing.  It was not a final order, as the court intended to and did in fact hold a hearing to determine whether Appellant and Mother were in a common law marriage, consider whether there was some equitable basis to deviate from the strict requirements of the Wyoming Parentage Act, and presumably to consider the results of the paternity test. *Platt v. Platt*, 2014 WY 142, ¶ 27, __ P.3d __, __ (Wyo. 2014) (tentative or incomplete action is not final).  The district court had not yet issued a ruling based on that hearing when the motion was filed.

[¶33]  The motion can more accurately be considered one for reconsideration or consideration of another theory before judgment. *Steranko v. Dunks*, 2009 WY 9, ¶ 6, 199 P.3d 1096, 1097 (Wyo. 2009) (prejudgment motions to reconsider, whether denominated as such or not, are valid in Wyoming).

[¶34]  The district court described Appellant's theories as "evolving," and we certainly agree with that description.  The theories were raised in the district court, but belatedly

---

[9] Although the elements of *in loco parentis*, psychological parentage, and de facto parentage are slightly different, we will occasionally refer to them collectively as de facto parentage.

and not in a way conducive to fairness to the opposing party or in a manner calculated to assure that the district judge had a full opportunity to consider them. The theories should have been identified in pretrial documents, and the evidence presented at the January 23, 2013 hearing should have been tailored to their elements and explained through cogent argument, which did not occur. The record is barren of any indication that Appellant's counsel requested further hearings to present or explain evidence to support these theories after January 23, 2013. Mother's attorney presented evidence to address the issues Appellant did identify prior to the hearing.

[¶35] We would be justified in not addressing the merits of these arguments. However, because the district court did not render a final decision until after the issues were raised, and because it gave Appellant leave to address equitable grounds for relief in supplemental briefing after the January 23 hearing, we will do so, but with the warning that such leniency cannot be expected in every case.[10]

### De Facto Parentage

[¶36] De facto parents are defined in § 2.03 of the ALI *Principles of the Law of Family Dissolution*:

> A *de facto parent* is an individual other than a legal parent or a parent by estoppel who, for a significant period of time not less than two years, (i) lived with the child and, (ii) for reasons primarily other than financial compensation, and with the agreement of a legal parent to form a parent-child relationship, or as a result of a complete failure or inability of any legal parent to perform caretaking functions, (A) regularly performed a majority of the caretaking functions for the child, or (B) regularly performed a share of caretaking functions at least as great as that of the parent with whom the child primarily lived.

ALI Principles of the Law of Family Dissolution § 2.03 (2002 updated 2014).

[¶37] Other states have adopted statutes allowing stepparents or siblings to seek visitation. Atkinson, *supra*, at 7-8. The Washington Supreme Court judicially adopted de facto parentage in *In re Parentage of L.B.*, 122 P.3d 161 (Wash. 2005). In that case, two women, Page Britain and Sue Carvin, were in a committed relationship. They

---

[10] We also note that the facts were poorly developed and not correlated to the criteria for de facto parentage under the ALI *Principles*, probably because Appellant's counsel did not appear to be asserting de facto parentage at the January 23, 2013 hearing. Noticeably lacking is any evidence of the amount of support Appellant provided, a time period of less than two years when Mother and Appellant lived together with KEP, and clarity as to the arrangement after the parties moved to Cheyenne.

decided to have a child. Britain was artificially inseminated and delivered L.B. Carvin took an active role in parenting L.B. Britain and Carvin's relationship ended acrimoniously when L.B. was six. *Id.* at 164.

[¶38] The Washington Supreme Court held that Carvin was entitled to rights as a de facto parent if she could prove the following:

> (1) [T]he natural or legal parent consented to and fostered the parent-like relationship, (2) the petitioner and the child lived together in the same household, (3) the petitioner assumed obligations of parenthood without expectation of financial compensation, and (4) the petitioner has been in a parental role for a length of time sufficient to have established with the child a bonded, dependent relationship, parental in nature.

*Id.* at 176. The Washington Court relied upon an earlier Wisconsin decision employing basically the same criteria. *Id.* at 173-74 (citing *In re Custody of H.S.H.-K.*, 533 N.W.2d 419 (Wis. 1995)).

[¶39] Justice Johnson dissented, joined by Justice Sanders, contending that the decision was an unconstitutional incursion on the rights of the adoptive mother, and that it violated a "detailed and complete statutory scheme" and created a new method of determining parentage by judicial fiat. 122 P.3d at 181 (Johnson, J., dissenting). The dissent concluded as follows:

> The court properly decided not to act as a legislature in *In re Dependency of J.H.* [815 P.2d 1380 (Wash. 1991)], but unfortunately today the same restraint is not shown. This court should have continued to follow the long precedent and declined to usurp the legislature's role.
>
> The majority wishes to act with the wisdom of Solomon in not only implementing but making the law in this sensitive family law area. Solomon's famous case with two women claiming the same baby had a different point, however, badly misapprehended by the majority. Solomon threatened to cut the baby in half in order to determine the *real* mother, to whom he restored full custody. 1 *Kings* 3:16–28. The court today holds an actual division more wise and sends the case and the child to lower courts for that division. Poor little L.B.

122 P.3d at 184.

12

[¶40] Other courts have reached the same result as the majority of the Washington Supreme Court did in *L.B*. *See, e.g.*, *In re Clifford K.,* 619 S.E.2d 138 (W.Va. 2005); *Elisa B. v. Superior Court,* 117 P.3d 660 (Cal. 2005); *C.E.W. v. D.E.W.,* 845 A.2d 1146 (Me. 2004); *Riepe v. Riepe,* 91 P.3d 312 (Ariz. Ct. App. 2004); *In re E.L.M.C.,* 100 P.3d 546 (Colo. Ct. App. 2004); *Rubano v. DiCenzo,* 759 A.2d 959 (R.I. 2000); *LaChapelle v. Mitten,* 607 N.W.2d 151 (Minn. Ct. App. 2000); *E.N.O. v. L.M.M.,* 711 N.E.2d 886 (Mass. 1999); *Laspina–Williams v. Laspina–Williams,* 742 A.2d 840 (Conn. 1999); *Jones v. Fowler,* 969 S.W.2d 429 (Tex. 1998).

[¶41] Still others have reached the same result by application of *in loco parentis* or the concept of psychological parentage. *See In re Parentage of A.B.,* 837 N.E.2d 965 (Ind. 2005); *T.B. v. L.R.M.,* 786 A.2d 913 (Pa. 2001) (recognizing the status of *in loco parentis); V.C. v. M.J.B.,* 748 A.2d 539 (N.J. 2000) (recognizing the status of "psychological parent"); *In re T.L.,* 1996 WL 393521 (Mo. Cir. May 7, 1996) (adopting the doctrine of "equitable parent"); *In re Custody of H.S.H.-K.,* 533 N.W.2d 419 (Wis. 1995) (permitting a person in a "parent-like" relationship with the child to petition for visitation); *Carter v. Brodrick,* 644 P.2d 850 (Alaska 1982) (permitting a non-parent with status of a psychological parent or *in loco parentis* to petition for custody).[11]

[¶42] The courts in both categories have held that legislative definitions of parentage based on a biological relationship or adoption do not preclude recognition of de facto parentage, and they emphasize the harm which can be done to a child by abruptly terminating a relationship with someone who has cared for him as a parent would. *See In re E.L.M.C., supra*.

[¶43] We acknowledge the risk of that harm in this case. Although Appellant's behavior has not always been ideal, and he may in desperation have made claims that could not be true, he has been devoted to KEP, who regards him as his father. The amicus brief provides us with scholarly authority indicating that preservation of attachments by children to those who have cared for them is critical to their healthy development. It also points out that scholarly literature indicates that these bonds develop without regard to biological ties. *See, e.g.*, National Research Council and Institutes of Medicine, *From Neurons to Neighborhoods: The Science of Early Childhood Development,* at 233-34 (Jack P. Shonkoff and Deborah A. Phillips eds., 2000). The proposition makes sense, and we have little doubt that it is true.

[¶44] On the other hand, the Delaware Supreme Court declined to recognize de facto parentage, holding that creating a new form of parent-child relationship required action

---

[11] Non-biological parents have also been granted status as de facto parents based upon the language of coparenting agreements. *See, e.g., Frazier v. Goudschaal*, 295 P.3d 542 (Kan. 2013) (enforcing a coparenting agreement entered into by two women, one of whom gave birth to children with assisted reproductive technology, when the other was described as a "de facto parent" in the agreement).

13

by the legislature. *Smith v. Gordon*, 968 A.2d 1 (Del. 2009), *superseded by statute* 13 Del. C. § 8-201 (2010). The parties in that case were also two women who had been involved in a long-term committed romantic relationship. They decided to adopt a child from Kazackstan. Because the laws of that country did not permit two women to adopt the same child, Smith became the adoptive parent, although Gordon participated in the adoption process and cared for the child. Gordon planned to adopt, but she was led to believe that she would have to care for the child for a year before she could do so under Delaware law. The parties separated, evidently also acrimoniously, before Gordon initiated adoption proceedings. *Id.* at 3. The trial court found that Gordon had standing to seek de facto parentage and that she was entitled to legal and physical custody of the child. *Id*. at 4.

[¶45] The Delaware Supreme Court reversed. It discussed the provisions of the Delaware Uniform Parentage Act, which is similar to Wyoming's. It ultimately concluded that the Delaware General Assembly had adopted a comprehensive parentage scheme which was based upon a biological relationship to the child or adoption. *Id*. at 14-15. It therefore held that Gordon lacked standing as a legal parent because the Act did not define her as such, although it noted that the legislature could certainly approve de facto parentage if it wished to do so. *Id*. at 16. Other courts have reached the same conclusion. *Moreau v. Sylvester*, 95 A.3d 416, 423 (Vt. 2014); *In re Scarlett Z.-D.*, 975 N.E.2d 755, 772-74 (Ill. App. 2012), *appeal denied, judgment vacated,* 992 N.E.2d 3 (Ill. 2013); *In re Scarlett Z.-D*, 11 N.E.3d 360 (Ill. App. 2014);[12] *Jones v. Barlow*, 154 P.3d 808, 818-19 (Utah 2007); *Alison D. v. Virginia M.*, 572 N.E.2d 17, 29 (N.Y. 1991).

[¶46] In response to *Smith v. Gordon*, the Delaware General Assembly soon took up the challenge and enacted a definition of de facto parentage very similar to that adopted by the Washington Supreme Court in *In re Parentage of L.B., supra*. The Delaware Supreme Court gave full effect to the General Assembly's decision in *Smith v. Guest*, 16 A.3d 920 (Del. 2011).[13]

[¶47] We find the reasoning of the Delaware Supreme Court in *Smith v. Gordon* more persuasive than that of the Washington Supreme Court in *In re Parentage of L.B.* The version of the Uniform Parentage Act adopted by the Wyoming Legislature indicates that

---

[12] The Illinois Supreme Court recognized the equitable adoption after the intermediate court of appeal rendered its first decision, and therefore the Supreme Court vacated that decision and remanded. On remand, the intermediate court of appeal continued to decline to recognize de facto, psychological or *in loco parentis* rights, but remanded to the trial court to develop a record and rule on whether equitable adoption would apply in this case involving a Slovakian adoption by an unmarried couple.

[13] The parties to *Smith v. Guest* were the same as in *Smith v. Gordon*; evidently Gordon's last name changed between the two decisions. The legislation passed by the Delaware General Assembly provided that the law would be applied retroactively, and that "[n]o Court decision based upon a finding that Delaware does not recognize de facto parent status shall have collateral estoppel or res judicata effect." *Smith v. Guest*, 16 A.3d at 924. The court upheld this provision.

the "'parent-child relationship' means the legal relationship between a child and a parent of the child. The term includes the mother-child relationship and the father-child relationship." Wyo. Stat. Ann. § 14-2-402(a)(xiii). Section 14-2-501 defines those relationships as follows:

> (a) The mother-child relationship is established between a woman and a child by:
>
> > (i) The woman's having given birth to the child;
> > (ii) An adjudication of the woman's maternity; or
> > (iii) Adoption of the child by the woman.
>
> (b) The father-child relationship is established between a man and a child by:
>
> > (i) An unrebutted presumption of the man's paternity of the child under W.S. 14-2-504;
> > (ii) An effective acknowledgment of paternity by the man under article 6 of this act, unless the acknowledgment has been rescinded or successfully challenged;
> > (iii) An adjudication of the man's paternity;
> > (iv) Adoption of the child by the man; or
> > (v) The man's having consented to assisted reproduction by his wife under article 8 of this act which resulted in the birth of the child.

Wyo. Stat. Ann. § 14-2-501 (LexisNexis 2013).

[¶48] These criteria are comprehensive, and as we discussed above, could in fact have resulted in Appellant being adjudicated as KEP's father even though he was not the biological father if he had met all of the statutory requirements to be a presumed parent, and if a petition to disprove parentage was not timely filed. We also note that the Wyoming Legislature adopted the Wyoming Parentage Act in 2003. 2003 Wyo. Sess. Laws ch. 93, § 1 *et seq*. This was not only after some of the cases relying upon the doctrines of *in loco parentis* or psychological parentage were decided, but also after the American Law Institute adopted the *Principles of the Law of Family Dissolution* in 2000 and first published the *Principles* in 2002.

[¶49] We presume that the legislature has acted in a thoughtful and rational manner with full knowledge of existing law when it enacts a statute. *DiFelici v. City of Lander*, 2013 WY 141, ¶ 31, 312 P.3d 816, 824 (Wyo. 2013) (citing *Redco Constr. v. Profile Prop.*, 2012 WY 24, ¶ 37, 271 P.3d 408, 418 (Wyo. 2012)). We must conclude that the legislature defined the mother-child and father-child relationships as it did advisedly.

15

[¶50] We are mindful that the Washington Supreme Court relied upon a statute somewhat similar to one enacted by our legislature, which preserves Wyoming courts' power to apply the common law:

> The common law of England as modified by judicial decisions, so far as the same is of a general nature and not inapplicable, and all declaratory or remedial acts or statutes made in aid of, or to supply the defects of the common law prior to the fourth year of James the First (excepting the second section of the sixth chapter of forty-third Elizabeth, the eighth chapter of thirteenth Elizabeth and ninth chapter of thirty-seventh Henry Eighth) and which are of a general nature and not local to England, are the rule of decision in this state when not inconsistent with the laws thereof, and are considered as of full force until repealed by legislative authority.

Wyo. Stat. Ann. § 8-1-101 (LexisNexis 2013).[14] The Washington court found the authority granted by its version of this statute sufficient to permit it to "fill interstices that legislative enactments do not cover," and that it therefore had authority to recognize de facto parentage. *In re Parentage of L.B.*, 122 P.3d at 166-68.

[¶51] Our statutes are, of course, not identical to those of Washington, but when we review the involvement of our legislature in the parent-child relationship, we do not find a gap of sufficient size to permit us to adopt the de facto parent doctrine. The legislature has acted extensively to define the parent-child relationship and the relationships of children with those who are not their legal parents by setting the requirements for adoption (Wyo. Stat. Ann. §§ 1-22-101 *et seq.*); establishing support requirements for legal parents (§ 20-2-304); defining the rights of grandparents and caregivers (§§ 20-7-101, -102); providing for guardians of minor children (§§ 3-2-101 *et seq.*); providing measures for the protection of children from abuse and neglect and for children in need of supervision (§ 14-3-401 *et seq.* and § 14-6-401 *et seq.*); and setting both the procedure and grounds for termination of parental rights (§§ 14-2-308 *et seq.*) We have in the past

---

[14] Washington's version of this statute provides:

> The common law, so far as it is not inconsistent with the Constitution and laws of the United States, or of the state of Washington nor incompatible with the institutions and condition of society in this state, shall be the rule of decision in all the courts of this state.

Wash. Rev. Code 4.04.010.

declined to use common law powers to modify relationships on which the legislature has acted. *In re Roberts' Estate*, 58 Wyo. 438, 467-68, 133 P.2d 492, 503 (1943) (declining to recognize common law marriage in light of the statutory provisions governing marriage in this state); *In re Estate of Scherer*, 2014 WY 129, ¶ 21, 336 P.3d 129, 135 (Wyo. 2014) (declining to recognize equitable adoption in light of provision of the Wyoming Probate Code).

[¶52] There are also practical problems more suited to the legislative process than the time-consuming case-by-case method the courts would be required to employ to define the rights and duties of the parties:

- It is not clear how recognizing de facto parentage would affect a noncustodial biological parent's rights. In this case, the biological father was not even given notice of these proceedings according to the record. The record does reflect that he has never been a parent to KEP, and Appellant, to his credit, has acted in that capacity since KEP was born. However, all cases will not be so clear. The de facto parentage cases do not tell us how a de facto parent's rights would interact with those of a biological parent. On the other hand, the United States Supreme Court has significantly limited the circumstances in which a grandparent can obtain visitation over a biological parent's objection due to the fundamental nature of the rights of a biological parent. *Troxel v. Granville*, 530 U.S. 57, 71, 120 S.Ct. 2054, 2063, 147 L.Ed.2d 49 (2000). The same issues arise in this context.

- The extent of the rights to be obtained must be determined. The Wyoming Legislature has limited the rights of grandparents and caregivers to visitation. The cases cited above allow a de facto parent to obtain custody if the court deems it to be in the child's best interest, which could limit a biological parent to visitation with the child.

- The ALI adopted a minimum time frame for de facto parentage to arise, while *L.B.* did not.

- Evidently there could be more than one de facto parent if the child's legal parent has multiple relationships during his minority. *See* Atkinson, *supra*, at 16. The interaction between individuals holding those rights and biological parents needs to be governed by some objective criteria.

- The case law does not reflect how and for what reasons de facto parentage could be terminated. We presume that a de facto parent, like a biological parent, can engage in abuse or neglect sufficient to justify severing the relationship.

17

- De facto parentage contemplates that a non-custodial de facto parent would be obligated to pay child support. It is difficult to anticipate how the duty to support a child would be apportioned between a non-custodial biological parent and a de facto parent.

[¶53] An Illinois intermediate appellate court summed up its reasons for declining to recognize de facto parentage aptly:

> While we are not unsympathetic to Jim's position, or indeed, to Scarlett's situation (especially having read the *amicus* brief submitted by the Family Institute at Northwestern University, *et al.*), not only would it be inappropriate for us to ignore existing Illinois law, but our doing so would likely be fraught with unintended consequences. Legal change in this complex area of social significance must be the product of careful, extensive policy debate, sensitive not only to the evolving realities of nontraditional families and the needs of the persons within those families, not the least of whom are the children, but also to parents' fundamental liberty interest embodied in the superior rights doctrine and its restriction of the ability of the state to interfere in family matters. In short, the comprehensive legislative solution demanded here must be provided by our General Assembly.

*In re Scarlett Z.-D.,* 975 N.E.2d at 772. We also decline to recognize de facto parentage, instead deferring to the Wyoming Legislature to recognize and define that relationship if it wishes to do so.

### Parentage by Estoppel

[¶54] The elements of parentage by estoppel are also set forth § 2.03 of ALI *Principles*:

> (1) Unless otherwise specified, a *parent* is either a legal parent, a parent by estoppel, or a de facto parent. (a) A *legal parent* is an individual who is defined as a parent under other state law. (b) A *parent by estoppel* is an individual who, though not a legal parent, (i) is obligated to pay child support under Chapter 3; or (ii) lived with the child for at least two years and (A) over that period had a reasonable, good-faith belief that he was the child's biological father, based on marriage to the mother or the actions or representations of the mother, and fully accepted parental responsibilities consistent

with that belief, and (B) if some time thereafter that belief no longer existed, continued to make reasonable, good-faith efforts to accept responsibilities as the child's father, or (iii) lived with the child since the child's birth, holding out and accepting full and permanent responsibilities as parent, as part of a prior co-parenting with the child's legal parent (or, if there are two legal parents, both parents), to raise a child together each with full parental rights and responsibilities, when the court finds that recognition of the individual as a parent is in the child's best interests; or (iv) lived with the child for at least two years, holding out and accepting full and permanent responsibilities as a parent, pursuant to an agreement with the child's parent (or, if there are two legal parents, both parents), when the court finds that recognition of the individual as a parent is in the child's best interest.

ALI Principles, *supra*, § 2.03 (emphasis in original). Although the presentation of this claim to the trial court suffers from the same problems as the de facto parentage claim, we will consider it.

[¶55] We recognize that parentage by estoppel may be a somewhat more manageable doctrine than de facto parentage because there is probably no realistic possibility that more than one person could reasonably believe himself to be the parent of a child and live in the same home for two years. However, we will decline to adopt the doctrine for the same reasons we declined to recognize de facto parentage.

[¶56] In addition, we note that the legislature adopted something similar to parentage by estoppel when it enacted the Wyoming Parentage Act, which creates criteria for presumptive parentage. We believe that in doing so it preempted the field. Moreover, this would not be an appropriate case for adoption of the doctrine, because the trial court found, in the face of conflicting testimony, that Appellant could not have believed himself to be KEP's parent because the court believed Mother's testimony that she was five months pregnant and "showing" when she met him, and that the child was delivered about four months later. That finding was not clearly erroneous in light of the conflicting evidence presented.

## SUMMARY AND CONCLUSION

[¶57] The district court did not err in concluding that Appellant was not KEP's presumptive parent, and even if he had been, the presumption was conclusively rebutted by a paternity test that was stipulated into evidence. We decline to adopt de facto parentage or parentage by estoppel, instead leaving that important policy decision to the Wyoming Legislature for the reasons stated above.

[¶58]  Affirmed.