2017 WY 107

**In the Matter of The Termination of Parental Rights to: ARLeB and RCW, Jr., Minor Children.**

**Teresa Louise LEBLANC, Appellant (Respondent),**

**v.**

**STATE of Wyoming, DEPARTMENT OF FAMILY SERVICES,' Appellee (Petitioner).**

**S-17-0020**

Supreme Court of Wyoming.

September 15, 2017

Representing Appellant: Kenneth DeCock, Attorney at Law, Sheridan, Wyoming

Representing Appellee: Peter K. Michael, Wyoming Attorney General; Misha Westby, Deputy Attorney General; Jill E. Kucera, Senior Assistant Attorney General. Argument by Ms. Kucera.

Guardians ad Litem: Office of the State Public Defender: Dan S. Wilde, Deputy State Public Defender; Aaron S. Hockman, Chief Trial and Appellate Counsel, Wyoming Guardian ad Litem Program. Argument by Mr. Hockman.

Before BURKE, C.J., and HILL, DAVIS, FOX, and KAUTZ, JJ.

DAVIS, Justice.

[¶1] Mother appeals the termination of her parental rights with respect to two of her sons, ARLeB and RCW, Jr.[1] We affirm.

## ISSUES

[¶2] Mother raises two issues:

1. Was there sufficient evidence to support termination of Mother's parental rights?
2. Did the district court err in closing the termination proceedings?

## FACTS

[¶3] Mother's lengthy history of involvement with the Department of Family Services (DFS) began in 2000, before the children involved in this case were born. In early February of 2010, law enforcement found drugs and paraphernalia in her home, which she shared with her boyfriend and another adult male. The children involved in this case were present when the drugs were found. When informed of this development, DFS had the county attorney file a neglect petition.

[¶4] At the time, Mother was already receiving individual counseling, substance abuse treatment, and parenting education. DFS prepared a case plan with a goal of family preservation. In April 2010, Mother signed a consent decree which included many of the requirements contained in the case plan.

[¶5] Six months later, while Mother was still subject to the terms of the consent decree, DFS received reports from law enforcement that she had assaulted her oldest child ZB after catching him in an inappropriate sex act, that ZB had bruised ARLeB's ears, and that officers had taken the children into protective custody. During its subsequent investigation, DFS found the family's home to be very cluttered and dirty, with an odor of urine. Mother could not locate prescription medication for ARLeB, and she had not been providing it to the child. DFS also discovered that Mother had allowed ZB to possess por-

---

1. Those boys were born in 2002 and 2007, respectively. Mother's third son, ZB, is an adult and was not a subject of the termination petition.

nographic material, and to continue to supervise the two younger children, even though ZB was known to have physically assaulted ARLeB.

[¶6] After a shelter care hearing, the juvenile court placed ARLeB and RCW, Jr. with their father and vacated the consent decree. It later determined that Mother had neglected her children following her admission that she had failed to adequately supervise them, and that she had exposed them to illegal substances and pornographic materials. Although ARLeB remained with his father, RCW, Jr. was returned to Mother's custody. Nevertheless, in February of 2011, with RCW, Jr. in the home, she held a tattoo party where alcohol and synthetic marijuana were present.

[¶7] Shortly thereafter, she had a number of encounters with law enforcement. In March of 2011, Mother was a subject in an ongoing drug investigation that ultimately resulted in her pleading guilty to charges of delivering a controlled substance. Three months later, she received a suspended sentence, but within a month, she was charged with driving while under the influence. RCW, Jr. and an unrelated but intoxicated juvenile were with her when she was pulled over.

[¶8] Nearly a year went by before either child was allowed to return to Mother's home, and during that time she continued to use synthetic marijuana, a problem that was brought to the attention of her probation officer, her DFS caseworker, and the drug court program in which she was participating. RCW, Jr. returned to live with Mother in March of 2012, and ARLeB returned five months later. ARLeB had been attending a therapy program due to his problems with starting fires, lying, and being defiant, and he began counseling upon his return to Mother's home.

[¶9] However, an October urinalysis revealed that Mother was using marijuana, a probation violation for which she was sanctioned by incarceration, and which shortly thereafter led to her participation in an inpatient treatment program. It also led her to agree with DFS to place ZB and RCW, Jr. in the care of others. She first had a teacher and then a family friend care for ARLeB.

[¶10] During roughly this same period, RCW, Jr.'s counselor observed signs that would later cause her to diagnose him as suffering from an adjustment disorder which was likely precipitated by difficulty dealing with a specific stressor. One circumstance that impacted him was his mother's drug use.

[¶11] Despite regular counseling sessions, ARLeB continued to exhibit a propensity for starting fires, lying, and vandalism while living with Mother, and also while later living with both the teacher and family friend. As a consequence, in February 2013, the juvenile court ordered him into DFS custody, and DFS placed him in a residential treatment facility.

[¶12] Mother remained in residential substance abuse treatment until April of 2013, and throughout the summer and fall of that year, circumstances were such as to renew hope that the neglect case could be resolved by reunification of the family. She obtained housing, found employment, continued her involvement in drug court, completed her GED, and continued in counseling. She began having unsupervised visitation with RCW, Jr. By January 2014, her caseworker hoped that RCW, Jr. could be placed back with Mother by summer.

[¶13] In fact, RCW, Jr. began a trial home placement with Mother in June of 2014, and on October 1 the juvenile court ordered that he be placed in Mother's legal and physical custody. However, later that very same day, DFS learned that officers had taken him into protective custody because he disclosed that drugs were being used in Mother's home. The next day Mother tested positive for marijuana, admitted to her probation officer that she had taken some in candy form, and also admitted that she had been using an intoxicant similar to synthetic marijuana for several months. In subsequent interviews with law enforcement, she reported that individuals living in her apartment had methamphetamine, and that she had delivered some. She also admitted that her roommates had gotten RCW, Jr. high on drugs on at least one occasion.

[¶14] On October 3, 2014, the juvenile court placed RCW, Jr. back in DFS custody. Later

the district court revoked Mother's probation, and in February of 2015 she was sent to prison at the Wyoming Women's Center. Due to her admissions and the condition of her home, she was also convicted of child endangerment. She received a sentence of three to five years imprisonment, which was suspended in favor of supervised probation, to begin upon completion of her existing prison sentence for delivery of a controlled substance.

[¶15] By March 2015, juvenile protection authorities began to focus on adoption as the potential permanency plan for both children. ARLeB had remained in residential treatment, and he had been diagnosed with Attention Deficit Hyperactivity Disorder, disruptive behavior disorder, major depression, and post-traumatic stress disorder. During counseling sessions, he reported abuse by one of his parents and sexual abuse by his sibling, ZB. At a multidisciplinary team meeting in May, Mother stated that she would relinquish her parental rights to ARLeB, noting that there were trust issues between them, and that the boy had not been around her for almost six years.

[¶16] Upon her release from the Women's Center on April 11, 2016, Mother resided at a Casper rescue mission for a bit over a month. She then moved in with a man that she had known for little more than a month. She met him after moving to Casper upon her release from prison. He was the janitor at a club for recovering substance abusers where she had started working as a cook.

[¶17] On August 14, 2015, while Mother was incarcerated at the Women's Center, DFS petitioned to terminate her (and the father's) parental rights to ARLeB and RCW, Jr. Of the three grounds alleged against her in support of the petition, the case went to a bench trial on two of them: 1) that she neglected or abused the two boys, that reasonable efforts to rehabilitate the family were unsuccessful, and that the children's health and safety would be seriously jeopardized if returned to her; and 2) that the children had been in foster care for fifteen of the most recent twenty-two months, and that she was unfit to have custody and control of them.

[¶18] Before presentation of evidence at the termination trial, the parties' attorneys, the children's guardian ad litem, and the district court discussed a DFS motion aimed primarily at safeguarding the confidentiality of documents produced in the juvenile neglect case involving ARLeB and RCW, Jr., which DFS planned to submit as exhibits in support of termination. Several means of achieving that end were considered, including redacting or restricting access to such records, and either closing the trial or issuing protective orders governing disclosure by persons attending the trial of testimony on confidential matters. With respect to closing the proceedings to the public, Mother's attorney represented that she was "fine" with that option so long as a person accompanying her for emotional or moral support could attend. Ultimately, the court closed the proceedings, but allowed Mother's support person to stay.

[¶19] Following a four-day trial at the end of June 2016, the district court took the case under advisement, and on August 17 it issued a detailed order terminating Mother's parental rights to ARLeB and RCW, Jr. She timely perfected this appeal from that order.

## DISCUSSION

### Sufficiency of the Evidence

[¶20] Because associating with one's family is a fundamental right, we apply strict scrutiny when we evaluate the sufficiency of the evidence supporting the termination of parental rights using the clear and convincing evidence standard. That is, we ask whether the evidence, when otherwise viewed in the light most favorable to the State—assuming its evidence to be true and disregarding all conflicting evidence—would persuade a reasonable trier of fact that it is highly probable that the statutory grounds stated for termination are true. *In re KGS*, 2017 WY 2, ¶ 14, 386 P.3d 1144, 1147 (Wyo. 2017) (quoting *In re HLL*, 2016 WY 43, ¶ 39, 372 P.3d 185, 193 (Wyo. 2016)).

[¶21] Where more than one statutory basis for termination is alleged, as in Mother's case, we need not consider all grounds if sufficient evidence supports one of them. *KGS*, ¶ 21, 386 P.3d at 1148; *In re*

*AGS*, 2014 WY 143, ¶ 18, 337 P.3d 470, 477 (Wyo. 2014); *In re LL*, 2007 WY 92, ¶ 22, 159 P.3d 499, 506 (Wyo. 2007). Thus, although DFS alleged that Mother was subject to termination of her parental rights by virtue of both Wyo. Stat. Ann. § 14-2-309(a)(iii) and (a)(v), we need only consider the latter, which requires evidence that the children were in foster care under responsibility of the State for fifteen of the most recent twenty-two months, and that she was unfit to have custody and control of them.

[¶22] Mother concedes that the "foster care" requirement was adequately proven. Consequently, we may limit our examination of the evidence to the question of her lack of fitness. We have held that the concept of fitness includes the ability to meet the ongoing physical, mental, and emotional needs of the children. *KGS*, ¶ 16, 386 P.3d at 1147; *HLL*, ¶ 42, 372 P.3d at 194. We have similarly indicated that fitness relates to a parent's ability to provide or maintain a "positive, nurturing parent-child relationship." *Matter of GP*, 679 P.2d 976, 1005 (Wyo. 1984).

[¶23] Furthermore, in a number of cases, this Court has more specifically delineated the sort of factors that will, in sufficient combination, support a conclusion that a parent is unfit to have custody and control of her children. They include: 1) inability to assist with therapy and recovery of a child with significant mental health needs; 2) lack of contact with and expressed lack of desire to take custody of the child; 3) contribution to the child's mental health or behavioral problems; 4) unstable living situation relating to employment or maintenance of a suitable home; 5) criminal record, particularly one primarily related to drug use, or a pattern of ongoing drug use; 6) failure to take responsibility for past conduct; 7) lack of emotional bond with the child; 8) failure to develop child-rearing skills; 9) convictions for crimes involving a potential for harming the child; 10) inability to monitor or make healthy nutritional choices or to provide a safe environment; 11) a history of surrounding herself and the children with unsafe individuals; and 12) the child has become upset by or resistant to visitation with the parent. *KGS*, ¶¶ 17-21, 386 P.3d at 1148; *In re KMJ*, 2010 WY 142, ¶¶ 17-19, 242 P.3d 968, 971-72 (Wyo. 2010); *In re LA*, 2009 WY 109, ¶ 16, 215 P.3d 266, 269 (Wyo. 2009); *In re AE*, 2009 WY 78, ¶ 19, 208 P.3d 1323, 1328 (Wyo. 2009); *LL*, ¶ 21, 159 P.3d at 505. Although a parent's fitness or lack thereof is to be measured at the time of the termination trial, a parent's past behavior is relevant to making that determination. *KGS*, ¶ 16, 386 P.3d at 1147; *HLL*, ¶ 42, 372 P.3d at 194.

[¶24] The district court touched on a number of the factors listed above in concluding that Mother was and remains unfit to have custody and control of her two sons, despite repeated exposure to substance abuse treatment and parenting classes. She lived with roommates who had serious and lengthy criminal histories, participated with them in distributing drugs, allowed drugs and pornography in her home, and drove while intoxicated with children in her car. The court correctly characterized all of the above behavior as putting her children at risk.

[¶25] Moreover, the court noted that, since her very recent release from prison, Mother had fallen back into the sort of behavior that helped create those problems. She moved into the apartment of a man she had known for only a month. Despite the fact that she had met some of her past unsavory roommates through organizations catering to recovering substance abusers, she was presently working at a similar organization and was again surrounded by recovering abusers on a daily basis. Furthermore, the stresses she claimed caused her past relapses into drug use continued unabated, and would likely become more severe if she assumed the responsibilities of parenthood.

[¶26] Finally, the court detailed evidence indicating that Mother's lifestyle and lack of parenting skills had at the very least contributed to the psychological and behavioral problems suffered by ARLₑB and RCW, Jr., and that she still either could not understand or was unable to meet the needs of the boys in these regards. It concluded that, despite her years of counseling and parenting classes, Mother was currently unfit to have custody and control of them.

[¶27] The district court's conclusions are amply supported by evidence, and we need

not supply further detail than we have in our observations concerning the record and those conclusions. The accuracy of the district court's conclusions is highly probable, and termination under Wyo. Stat. Ann. § 14-2-309(a)(v) is supported by clear and convincing evidence.

### Closure of the Trial

[¶28] Mother argues that the district court's closure of her termination trial was improper under Article 1, Section 8, of the Wyoming Constitution, which provides in pertinent part only that: "All courts shall be open[.]" We note that the legislature has required certain proceedings to be closed to the public by statute, including juvenile proceedings and actions to establish parentage.[2] The legislature made no such provision for the closure of proceedings in actions for the termination of parental rights, which we take as a mandate that such proceedings should generally be open to the public.

[¶29] This Court has held that a lower court's decision to close a trial or other proceeding to the public is a matter committed to that court's discretion. *State ex rel. Feeney v. Dist. Court of 7th Judicial Dist.*, 607 P.2d 1259, 1264 (Wyo. 1980). The abuse of discretion standard of review requires consideration of the reasonableness of a trial court's choice. *Harris v. State*, 2015 WY 50, ¶ 8, 346 P.3d 944, 945 (Wyo. 2015). "Judicial discretion is a composite of many things, among which are conclusions drawn from objective criteria; it means exercising sound judgment with regard to what is right under

the circumstances and without doing so arbitrarily and capriciously." *Id.* (quoting *Griswold v. State*, 2001 WY 14, ¶ 7, 17 P.3d 728, 731 (Wyo. 2001)). However, with respect to closing what are presumably open court proceedings, we have tightly confined the range of what will be deemed reasonable.

[¶30] We have noted that an interest in keeping trials open to the public has been raised under a variety of federal and state constitutional provisions. *Williams v. Tharp*, 2017 WY 8, ¶ 7, 388 P.3d 513, 516 (Wyo. 2017); *Feeney*, 607 P.2d at 1266-67. Taken together, they convey that openness enhances the citizenry's trust and confidence in the judicial process, in part because it insulates against attempts to use the courts as tools for persecution. *Williams v. Stafford*, 589 P.2d 322, 325 (Wyo. 1979), *abrogated on other grounds by Vaughn v. State*, 962 P.2d 149 (Wyo. 1998). Stated another way, a policy of openness encourages and protects the free discussion of governmental affairs, and it serves as a check on circumstances that might damage both the judicial process and those coming before the court. *Circuit Court of the Eighth Judicial Dist. v. Lee Newspapers*, 2014 WY 101, ¶ 13, 332 P.3d 523, 528 (Wyo. 2014).

[¶31] Because such interests are fundamental to the preservation of a just and free society, we have held that constitutionally provided rights to publicly accessible judicial proceedings may be abridged only in extraordinary circumstances. There must be a compelling reason for any restriction of public access, and any limitation must be narrowly

---

**2.** The statutes relating to abuse and neglect, juvenile, and children in need of supervision proceedings are virtually identical. Wyo. Stat. Ann. §§ 14-3-424(b), 14-6-224(b), and 14-6-424(b) (LexisNexis 2017). The language of the abuse and neglect statute is as follows:

> Except in hearings to declare a person in contempt of court, the general public are excluded from hearings under this act. Only the parties, counsel for the parties, jurors, witnesses, and other persons the court finds having a proper interest in the proceedings or in the work of the court shall be admitted. If the court finds it necessary in the best interest of the child, the child may be temporarily excluded from any hearing.

Wyo. Stat. Ann. § 14-3-424(b). The statute dealing with paternity proceedings provides as follows:

> Notwithstanding any other law concerning public hearings and records, any hearing or trial held under this act shall be held in closed court without admittance of any person other than those necessary to the action or proceeding. All papers and records other than the final judgment pertaining to the action or proceeding, whether part of the permanent record of the court or of a file in the state office of vital records services or elsewhere, are subject to inspection only by court order.

Wyo. Stat. Ann. § 14-2-819 (LexisNexis 2017). We can see from these statutes that the legislature clearly communicates its intent that certain proceedings must be closed to the public.

tailored to serve that competing interest. *Id.* ¶ 24, 332 P.3d at 531; *Williams*, 589 P.2d at 325.

[¶32] In this case, the district court closed the trial to preserve the confidentiality of DFS records concerning reports and investigations in the neglect proceedings which led to the termination case.[3] As already noted, the legislature chose not to enact a law closing these proceedings. We presume that the legislature acts in a thoughtful and rational matter with full knowledge of the law when it enacts—or in this case—does not enact a statute. *LP v. LF*, 2014 WY 152, ¶ 49, 338 P.3d 908, 919 (Wyo. 2014) (citing *DiFelici v. City of Lander*, 2013 WY 141, ¶ 31, 312 P.3d 816, 824 (Wyo. 2013), which in turn cites *Redco Constr. v. Profile Prop.*, 2012 WY 24, ¶ 37, 271 P.3d 408, 418 (Wyo. 2012)). We must therefore believe that the legislature understood that termination of parental rights proceedings would often necessarily include testimony about and documentation from child abuse and neglect proceedings, and it still decided that those proceedings are to be open to the public.

[¶33] Although there may be cases in which there could be a compelling reason for a district court to close all or part of termination proceedings, we do not think that is the case here. Nor do we think that closure was a remedy narrowly tailored to protecting confidentiality. The State's witnesses gave brief narratives of the progress of those parts of the neglect proceedings with which they were familiar, and generally described the nature of various meetings for the most part. The content of documents from the abuse-neglect proceedings was not disclosed to any significant degree. Rather, those documents were admitted for the limited purpose of explaining or verifying how and why the various witnesses came to be involved in the chain of actions that comprised the efforts of DFS to resolve the neglect proceedings by reuniting Mother and her sons. Moreover, they were then relegated to a confidential volume of the record which cannot be accessed by the general public.

[¶34] We understand that district courts will not always know what evidence will become part of a termination trial. We also understand the difficult decisions they may have to make as a termination case proceeds. However, we believe that information from the juvenile court record, particularly that which might in the future be embarrassing to the children involved, can be protected in these circumstances without closing the trial. Although doing so is undoubtedly more difficult than it sounds, district judges can use the case management tools they have to minimize any harmful effect from the public nature of these proceedings in all but the most unusual cases. Under these circumstances, we must conclude that closing the trial to the public was not a sufficiently narrow effort to protect confidentiality. That is not to say, however, that it would be appropriate to reverse the termination of parental rights due to what appears to be an abuse of discretion.

[¶35] Even if we accept an appellant's allegations of error, we will not overturn a court's rulings from a bench trial unless the appellant directs us to particularized facts showing that she was actually harmed or prejudiced by that error. *In re "H" Children*, 2003 WY 155, ¶¶ 24-25, 79 P.3d 997, 1003-04 (Wyo. 2003); *see also In re NDP*, 2009 WY 73, ¶ 18, 208 P.3d 614, 618 (Wyo. 2009). Mother has not even attempted to show us that she was harmed by the district court's actions, and we are therefore constrained to conclude that it was erroneous to have closed the proceedings in this case, that error was harmless.

## CONCLUSION

[¶36] Sufficient evidence supports the termination of Mother's parental rights with respect to ARLeB and RCW, Jr., and the closure of her trial was not reversible error. The order terminating those rights is therefore affirmed.

---

**3.** That confidentiality is required by Wyo. Stat. Ann. § 14-3-214, which makes it a crime to willfully violate its mandate.