# IN THE SUPREME COURT, STATE OF WYOMING

## 2021 WY 94

APRIL TERM, A.D. 2021

August 17, 2021

IN THE MATTER OF THE TERMINATION
OF PARENTAL RIGHTS TO: JPL, minor
child,

JENNIFER ANNE HOOD,

Appellant
(Respondent),

v.

STATE OF WYOMING, ex rel.
DEPARTMENT OF FAMILY SERVICES,

Appellee
(Petitioner).

IN THE MATTER OF THE TERMINATION
OF PARENTAL RIGHTS TO: JPL, minor
child,

GERALD LEAVITT,

Appellant
(Respondent),

v.

STATE OF WYOMING, ex rel.
DEPARTMENT OF FAMILY SERVICES,

Appellee
(Petitioner).

S-21-0018, S-21-0019

*Appeal from the District Court of Laramie County*
*The Honorable Peter H. Froelicher, Judge*


*Representing Appellant Jennifer Anne Hood:*
   Brianne C. Phillips of Overstreet Homar & Kuker, Cheyenne, Wyoming.

*Representing Appellant Gerald Leavitt:*
   Deborah L. Roden of Woodhouse Roden Nethercott, LLC, Cheyenne, Wyoming.

*Representing Appellee:*
   Bridget L. Hill, Wyoming Attorney General; Misha Westby, Deputy Attorney General; Jill E. Kucera, Senior Assistant Attorney General; Shawnna M. Lamb, Senior Assistant Attorney General. Argument by Ms. Kucera.

*Guardian ad Litem:*
   Joseph R. Belcher, Director, Wyoming Office of Guardian ad Litem; Kimberly Skoutary Johnson, Chief Trial and Appellate Counsel.

*Before FOX, C.J., and DAVIS[*], KAUTZ, BOOMGAARDEN, and GRAY, JJ.*

[*]*Chief Justice at time of oral argument.*

**BOOMGAARDEN, J., delivers the opinion of the Court; KAUTZ, J., files a specially concurring opinion.**

**NOTICE:  This opinion is subject to formal revision before publication in Pacific Reporter Third. Readers are requested to notify the Clerk of the Supreme Court, Supreme Court Building, Cheyenne, Wyoming 82002, of any typographical or other formal errors so that correction may be made before final publication in the permanent volume.**

**BOOMGAARDEN, Justice.**

[¶1]     Jennifer Hood (Mother) and Gerald Leavitt (Father) appeal the district court's order granting the Wyoming Department of Family Service's petition to terminate their parental rights under Wyo. Stat. Ann. § 14-2-309(a)(iii) and (a)(v).  We affirm the district court's ruling under Wyo. Stat. Ann. § 14-2-309(a)(v).

## ISSUES

[¶2]     The issues in this case are:

> I. Did the district court have subject matter jurisdiction?
>
> II. Does sufficient evidence support the district court's determination that the Department presented clear and convincing evidence that Mother and Father are "unfit to have custody and control of the child" pursuant to Wyo. Stat. Ann. § 14-2-309(a)(v)?[1]

## BACKGROUND

[¶3]     The Department has been working with the Hood/Leavitt family since 2015, when a neglect case was opened based on the Department's concerns that Mother was educationally neglecting her son HB.[2]  The educational neglect case was ongoing when, on January 4, 2018, Mother tested presumptive positive for methamphetamine, law enforcement arrested her and Father on warrants,[3] and law enforcement took JL and HB into protective custody.

### Juvenile Court Proceedings

[¶4]     On January 5, 2018, the district attorney filed a petition alleging Mother and Father neglected JL.[4]  The juvenile court promptly held a shelter care hearing.  The parties

---

[1] Because neither Mother nor Father raises the issue, we do not consider whether the Department's reasonable efforts should be a requirement in determining parental fitness under § 14-2-309(a)(v).  *See Dunlap v. State of Wyo., Dep't of Family Servs. (In re BAD)*, 2019 WY 83, ¶¶ 22–39, 446 P.3d 222, 227–33 (Wyo. 2019) (Fox, J., specially concurring).

[2] HB is JL's half-brother.  Mother and Father began their relationship in 2010, when HB was almost two years old.  JL was born in 2012.

[3] Mother's presumptive positive test was confirmed with a hair follicle test.  Father tested positive for THC in jail.

[4] HB was not included in this petition because he had an ongoing case.  The two cases proceeded concurrently.

1

stipulated to continued shelter care and JL remained in the Department's custody. At an initial hearing a few weeks later the parents denied the neglect allegations.

[¶5]    Two events central to this appeal occurred in April 2018. First, the Department placed JL in relative foster care with Father's brother and sister-in-law.[5] Second, Department caseworker Carly Drew Hutchinson[6] filed a *Family Service Case Plan* without Mother's or Father's signature after they did not call or attend meetings to discuss it. The plan identified the following safety issues and risks based on the Department's assessment: homelessness, unemployment, mental health, substance abuse, and criminal activity. The parents' plans were nearly identical. Each included general requirements related to the proceedings, and communication and cooperation with the Department. Each plan specified an objective—along with corresponding goals and steps—on housing, mental health, substance abuse, criminal activity, and financial stability. Mother's plan identified an additional mental health step.

[¶6]    The court issued a series of orders between May and July 2018. In its order following adjudication, it found: the parents had neglected JL, returning her home would be contrary to her welfare, and it was in JL's best interest to remain in the State's custody. The court ordered a multidisciplinary team to convene and return for final disposition. On final disposition, the court ordered legal custody remain with the State and physical placement remain at the discretion of the Department in consultation with the guardian ad litem. It designated family reunification as the permanency plan and ordered the parents to work their case plans. The court preserved the status quo following the June 2018 review hearing and ordered the parents to sign and follow their case plans.

[¶7]    The permanency plan remained reunification until January 2019, when the court changed it to adoption, and relieved the Department of further reunification efforts. Formal visitation stopped around that same time on the recommendation of several multidisciplinary team members.

[¶8]    The Department's April and June 2019 reports recommended that JL remain in relative foster care, and noted that the parents still did not cooperate with their case plan goals, stay in communication with their caseworker Ms. Batista, cooperate with drug testing, or maintain stable housing.

[¶9]    In August 2019, the Department filed an updated *Family Service Case Plan* after Mother told Ms. Batista she would not work a case plan signed by Ms. Hutchinson. Ms.

---

[5] JL remained with the same foster family for two and a half years, through the termination trial. It was a potential adoptive home.

[6] Mother did not get along with Ms. Hutchinson, who worked with the family from October 2017 through September 2018. She got along better with Department caseworker Breanna Batista, who inherited the case from Ms. Hutchinson in October 2018 and worked with the family through the termination trial in August/September 2020.

Batista replaced Ms. Hutchinson's name with hers and updated the due dates. Otherwise, the plans remained the same because neither parent had addressed the issues identified a year prior.

[¶10] The court allowed JL to move to Texas with her foster family in April 2020. Mother and Father did not mind JL moving to Texas, but they did not want her to move with her current foster family.

[¶11] The Department's June 2020 report identified the progress Mother and Father made since Fall 2019. As to drug testing, Mother had consistently attended all scheduled testing since her release from jail and tested negative. Father had submitted to drug tests following his release from jail but missed several between November 2019 and February 2020. He submitted to a hair follicle test in March 2020 and it was negative for all substances. As to mental health and substance abuse, Mother and Father completed their clinical assessments. Father's assessment recommended individual therapy, but he claimed he did not know this and thus had not yet started therapy. Mother had not signed an information release so Ms. Batista did not know what her assessment recommended. As to parenting, Mother and Father completed a parenting course; however, the facilitator voiced concerns about Mother's perception of what it means to be a safe parent. As to housing, Mother and Father were residing with Father's aunt and planned to move when the bond conditions of Mother's ongoing methamphetamine possession case so allowed. As to financial stability, Father reported employment but had provided no confirmation.

[¶12] After the June 2020 review hearing, the court found the parents had made progress "toward alleviating or mitigating the causes necessitating placement outside of the home[,]" but returning JL to the home at that time would be contrary to her welfare and it was in JL's best interest to remain in the State's custody. The permanency plan remained adoption.

### *District Court Proceedings*

[¶13] The Department filed its petition to terminate Mother's and Father's rights on July 10, 2019, about six months after the juvenile court changed the permanency plan to adoption.

[¶14] The district court held a four-day bench trial August 31 to September 3, 2020. Following the close of trial, the district court held the Department proved, by clear and convincing evidence, that Mother's and Father's parental rights should be terminated under § 14-2-309(a)(iii) and (v). It also held it was in JL's best interest to terminate their parental rights.

[¶15] Mother and Father each timely appealed, challenging the district court's jurisdiction over the termination proceedings and the sufficiency of the evidence to terminate their parental rights.

## *DISCUSSION*

### I.      *The district court had subject matter jurisdiction.*

[¶16] Whether the district court had subject matter jurisdiction over the termination proceedings is a question of law we review de novo. *CLB v. State of Wyo., Dep't of Family Servs. (In re HLL)*, 2016 WY 43, ¶ 16, 372 P.3d 185, 189 (Wyo. 2016) (citation omitted).

[¶17] Mother and Father suggest the district court lacked jurisdiction to terminate their parental rights because law enforcement did not have authority to take JL into protective custody in the first place. Existing precedent instructs that the district court had jurisdiction to terminate their parental rights regardless of whether law enforcement had authority to take JL into protective custody.

[¶18] We have held that "the district court's subject matter jurisdiction in a termination action is separate from the issue of the children's shelter care placement[,]" which is a proceeding before the juvenile court. *In re HLL*, ¶¶ 15–19, n.3, 372 P.3d at 188–89, n.3 (rejecting the parent's argument that because the Department did not follow its own rules and procedures when it took the children into shelter care in the child protection case, there was no subject matter jurisdiction, and therefore the district court did not have authority to decide the Department's separate termination action).

[¶19] "Under Wyoming Constitution Article 5, § 10, the district court has original jurisdiction over proceedings to terminate parental rights." *Id.* ¶ 18, 372 P.3d at 189. "The Termination of Parental Rights Act also provides that termination proceedings must be heard in the district court." *Id.* (citing Wyo. Stat. Ann. § 14-2-308(a)(iv)). "[A] district court's 'subject matter jurisdiction is invoked with the filing of a complaint stating a case belonging to a general class over which the authority of the court extends.'" *Id.* ¶ 17, 372 P.3d at 189 (citation omitted). The Department is an agency authorized to file a termination action. Wyo. Stat. Ann. § 14-2-310 (LexisNexis 2021); *In re HLL*, ¶ 18, 372 P.3d at 189; *In re LB*, 2014 WY 10, ¶ 12, 316 P.3d 1184, 1187 (Wyo. 2014).

[¶20] Thus, regardless of whether law enforcement had authority to take JL into protective custody—an issue Mother and Father could have but did not raise in the juvenile court—the district court had jurisdiction over these separate termination proceedings.

4

***II.*** ***Sufficient evidence supports the district court's determination that the Department presented clear and convincing evidence that Mother and Father are "unfit to have custody and control of the child" pursuant to Wyo. Stat. Ann. § 14-2-309(a)(v).***

[¶21] We apply the following standard of review to determine sufficiency of the evidence to terminate parental rights:

> Due to the tension between the fundamental liberty of familial association and the compelling state interest in protecting the welfare of children, application of statutes for termination of parental rights is a matter for strict scrutiny. As part of this strict scrutiny standard, a case for termination of parental rights must be established by clear and convincing evidence. Clear and convincing evidence is that kind of proof that would persuade a trier of fact that the truth of a contention is highly probable. Rigorous though this standard may be, we apply our traditional principles of evidentiary review when a party challenges the sufficiency of the evidence supporting termination. Thus, we examine the evidence in the light most favorable to the party prevailing below, assuming all favorable evidence to be true while discounting conflicting evidence presented by the unsuccessful party.

*Harmon v. State of Wyo., Dep't of Family Servs. (In re DKS)*, 2020 WY 12, ¶ 19, 456 P.3d 918, 924 (Wyo. 2020) (quoting *In re BAD*, ¶ 14, 446 P.3d at 225). While the district court found clear and convincing evidence supported termination of Mother's and Father's parental rights under Wyo. Stat. Ann. § 14-2-309(a)(iii) and (v), we need only determine the evidence was sufficient under one of those statutory bases to affirm. *In re BAD*, ¶ 15, 446 P.3d at 225–26 (citation omitted).

[¶22] A court may terminate parental rights under § 14-2-309(a)(v) if the Department proves two elements by clear and convincing evidence: (1) "[t]he child has been in foster care under the responsibility of the state of Wyoming for [15] of the most recent [22] months" and (2) "the parent is unfit to have custody and control of the child[.]" Neither Mother nor Father disputes the first element; they both dispute the second.

[¶23] Although the termination statutes do not define the term "unfit," we have explained that "[f]itness includes the ability to meet the ongoing physical, mental and emotional needs of the child." *In re BAD*, ¶ 16, 446 P.3d at 226 (quoting *AJJ v. State of Wyo., Dep't of Family Servs. (In re KMJ)*, 2010 WY 142, ¶ 15, 242 P.3d 968, 971 (Wyo. 2010)). The decision whether a parent is fit to have custody and control of a child must be made within

the context of the particular case—it "depends upon the situation and attributes of the specific parent and child." *Id.* (quoting *In re KMJ*, ¶ 15, 242 P.3d at 971).

[¶24]   "[I]n the ordinary parental rights termination case consideration must be given to a combination of factors, incidents, and conditions that demonstrate" fitness. *Id.* (quoting *CL v. State of Wyo., Dep't of Family Servs. (In re AD)*, 2007 WY 23, ¶ 26, 151 P.3d 1102, 1108 (Wyo. 2007)).  "Rarely do we find a single condition or incident that, standing alone, would justify termination." *Id.* (quoting *In re AD*, ¶ 26, 151 P.3d at 1108).  Rather, fitness "is usually manifested by numerous incidents and conditions extending over a considerable length of time." *Id.* (quoting *In re AD*, ¶ 26, 151 P.3d at 1108).

[¶25]   Mother argues the district court based its fitness determination almost exclusively on her past conduct even though the Department had to prove she was unfit at the time of trial.  And, mischaracterizing the factors set forth in *In re DKS*, ¶ 22, 456 P.3d at 925, as a multi-factor balancing test, she contends the Department failed to prove she was unfit at the time of trial.[7]  Father asserts the district court "lumped [M]other and [F]ather together,

---

[7] *In re DKS* identified "[f]actors we have considered when evaluating whether the Department established by clear and convincing evidence that a parent is unfit":

> 1) inability to assist with therapy and recovery of a child with significant mental health needs; 2) lack of contact with and expressed lack of desire to take custody of the child; 3) contribution to the child's mental health or behavioral problems; 4) unstable living situation relating to employment or maintenance of a suitable home; 5) criminal record, particularly one primarily related to drug use, or a pattern of ongoing drug use; 6) failure to take responsibility for past conduct; 7) lack of emotional bond with the child; 8) failure to develop child-rearing skills; 9) convictions for crimes involving a potential for harming the child; 10) inability to monitor or make healthy nutritional choices or to provide a safe environment; 11) a history of surrounding herself and the children with unsafe individuals; and 12) the child has become upset by or resistant to visitation with the parent.

¶ 22, 456 P.3d at 925 (quoting *Gillen v. State of Wyo., Dep't of Family Servs. (In re KCS)*, 2019 WY 15, ¶ 13, 433 P.3d 892, 896 (Wyo. 2019)).  The list is not exhaustive.  We have considered other factors, such as a parent's failure to comply with their case plan. *See, e.g.*, *Clark v. State of Wyo., Dep't of Family Servs. (In re GGMC)*, 2020 WY 50, ¶¶ 32–33, 460 P.3d 1138, 1148 (Wyo. 2020); *In re AD*, ¶¶ 13–30, 151 P.3d at 1106–09.

Moreover, *In re DKS* did not prescribe a multi-factor balancing test as Mother suggests. *Compare In re DKS*, ¶ 22, 456 P.3d at 925, *and Matter of EMM*, 2018 WY 36, ¶¶ 11, 13, 414 P.3d 1157, 1160 (Wyo. 2018) (explaining that a trial court must consider three factors to resolve a motion to set aside entry of default and, in applying the factor test, "[n]o single factor is dispositive of the issue, and the ultimate determination under a factor test rule is made by weighing or balancing the conclusions on the individual factors against one another").  Rather, it repeated a list of examples of the sort of circumstances that, based on our termination of parental rights precedent, may help support the conclusion that a parent is unfit. *See LeBlanc v. State Dep't of Fam. Servs.*, 2017 WY 107, ¶ 23, 401 P.3d 932, 936 (Wyo. 2017) (drawing on five

6

improperly holding evidence about one parent against the other." He also challenges the emphasis placed on certain evidence and the district court's stated rationale for terminating his rights. In sum, Mother and Father would have us focus exclusively on their respective progress as of trial.

[¶26] We acknowledge Mother's and Father's fitness improved from approximately October 2019 through August 2020—a few months after the Department filed its termination petition and for about 10 months leading up to trial. Mother and Father had been living in the same apartment since June 2020. Ms. Batista visited the home in July and deemed it adequate. Mother had been reporting for drug testing three times a week since her release from jail in November 2019 and she had been testing negative. She had not engaged in criminal activity since her release. She completed a clinical assessment for mental health and substance abuse in March 2020, and attended a few counseling sessions after that. She completed a parenting course in Spring 2020, five sessions of relapse prevention in October 2019, and a domestic violence curriculum in August 2019.

[¶27] Father had been required to report for drug testing three times a week since his release from jail in October 2019. Though an exhibit reflected that he missed several testing dates in November and December 2019, and Ms. Batista testified that he missed several testing dates between November 2019 and February 2020, he otherwise tested negative for drugs prior to trial. He faced no criminal charges after his release from jail. He completed a clinical assessment for mental health and substance abuse in February 2020, as well as a parenting course in Spring 2020. He testified that he had been working at a fast-food restaurant since April or May 2020 and made about $2,000 per month.

[¶28] Our decision, however, does not rest on these facts alone. We must examine all the evidence in the light most favorable to the Department because it prevailed below. *See In re DKS*, ¶ 19, 456 P.3d at 924. In other words, we must assume all evidence favorable to the Department to be true while discounting conflicting evidence Mother and Father presented. *See id.* Evidence of past behavior is also relevant to our evaluation of parental fitness at the time of trial. *See RGS v. State of Wyo., Dep't of Family Servs. (In re KGS)*, 2017 WY 2, ¶ 16, 386 P.3d 1144, 1147 (Wyo. 2017).

### Failure to Comply with Case Plans

[¶29] Central to the Department's case, Mother and Father made no progress on their case plans for 18 months—from April 2018 to Fall 2019—and, considering the record as a whole, they made limited progress over the next 10 months leading up to trial. The case plan requirements and evidence pertaining to each objective help provide a complete

termination of parental rights cases to establish the list for the first time and noting that "in a number of cases, this Court has more specifically delineated the sort of factors that will, in sufficient combination, support a conclusion that a parent is unfit to have custody and control of her children").

picture of Mother's and Father's fitness as of trial, so we consider those requirements and objectives in turn.

[¶30] The case plans included general requirements related to the proceedings, and cooperation and communication with the Department. Mother and Father were required to attend and participate in developing the case plan; attend and participate in multidisciplinary team meetings and court hearings; keep the case worker informed of their address/phone number; sign forms to release/share information with professionals as appropriate; and keep the case worker advised of any changes in circumstances including, but not limited to, arrests, relapses, hospitalizations or changes in people living with them.

[¶31] Mother never signed the April 2018 case plan, and Father signed it only after the juvenile court ordered the parents to do so. They did not attend multidisciplinary team meetings in May 2018, October 2018, December 2018, March 2019, and December 2019; they did attend such meetings in March and June 2020. They did not consistently attend family meetings. The Department had difficulty maintaining contact with them throughout the case.

[¶32] The case plans required that Mother and Father take the following steps to obtain/maintain suitable and stable housing: actively seek safe housing options; obtain suitable housing within three months of the case plan filing; provide the Department proof of a lease within one month of signing; ensure all residents follow the lease terms; maintain a clean and safe home free from health/safety hazards; maintain living arrangements for a minimum of three months; and inform the worker of any residence changes within 24 hours.

[¶33] Neither parent obtained suitable housing within three months of the April 2018 case plan filing. By trial, they were close to maintaining adequate housing for the prescribed minimum three months. They had a history of unstable housing, including periods in which they experienced homelessness, "couch surfed," or were in jail.

[¶34] The case plans required that Mother and Father take the following steps to stabilize their mental health so they could safely and effectively parent: participate in a mental health evaluation within three months of the case plan filing; follow the mental health provider's recommendations; sign a release so the Department can communicate with the mental health provider; provide the Department a copy of the evaluation within two weeks of completion; attend treatment sessions as recommended; take medication according to doctor's orders; and gain an understanding of how their mental health affects their parenting ability. In addition, Mother had to develop a safety plan with the Department and mental health provider for how the children would be cared for if her mental health adversely affected her ability to safely parent.

[¶35] Neither parent completed a mental health evaluation within three months of the April 2018 case plan filing. It took them nearly two years to do so. Even then, they did not provide the Department a copy of the evaluation within two weeks of completion. Ms. Batista received a copy of Father's evaluation in May or June 2020, and she received a copy of Mother's in August 2020, just prior to trial.

[¶36] Mother had a history of mental health diagnoses. According to a May 2018 Department report, Mother stated that she had been diagnosed with bipolar disorder and schizophrenia; she also had Dissociative Identity Disorder, which resulted in her having an alternate personality. Mother confirmed those diagnoses at trial, but disputed when she was last diagnosed. When Ms. Batista reviewed HB's file, she learned Mother "has an alternate personality named Lydia who was present throughout the H.B. case." There were concerns in 2016 "that Lydia . . . was a source of abuse to the children."

[¶37] Mother had been hospitalized at the Behavioral Health Unit in Cheyenne "quite a few" times for her mental health. She remembered staying there in September 2016, but did not remember her principal diagnoses on discharge being "bipolar II disorder, PTSD, cluster B personality traits, marijuana use disorder, and methamphetamine disorder." She recalled leaving the hospital against medical advice, with several prescriptions. Mother testified that she was not currently on any medication because it did not help.

[¶38] For part of JL's case, Mother showed resistance to seeking treatment. By trial, she had obtained a clinical assessment but attended only a couple of therapy sessions. Christina Schofield, the therapist who completed Mother's clinical assessment and treatment plan in March 2020, testified that the clinical assessment was a basic mental health evaluation. She referred Mother to a psychiatrist for a more in-depth evaluation, and did not know where Mother was in that lengthy process. Ms. Schofield recommended meeting Mother for individual sessions on an "intense basis," at least every two weeks, because Mother had a high level of determination to start and work through therapy. She and Mother also briefly discussed "eye movement desensitization reprocessing" as a treatment option. However, Ms. Schofield had only seen Mother twice since March 2020—once in April and once in August. Ms. Schofield had been available for more regular therapy during that time.

[¶39] Father had done little to address his mental health other than obtain a clinical assessment. The therapist who completed Father's clinical assessment diagnosed him with "[a]djustment disorder with anxiety." The treatment plan included a recommendation for "[Individual] and [Group] therapy CBT, parent training, SFBT, MI" one to five times a month. Father had not participated in therapy as of trial.

[¶40] Father seemed resistant to treatment. At a June 2020 multidisciplinary team meeting, Father stated he was unaware of the recommendation for individual therapy so he had not started it yet, but would follow up with the counseling center to schedule therapy.

9

At trial just a couple months later, Father did not recall being diagnosed with an adjustment disorder and denied that the assessment recommended therapy. He claimed that, as far as he knew, there were no treatment plans, but he generally conceded the assessment said what it said.

[¶41] The case plans required that Mother and Father take the following steps to embrace a drug free lifestyle: complete a substance abuse treatment evaluation within one month of the case plan filing; sign a release with the provider; provide the Department a copy of the evaluation within two weeks of completion; submit up to three random and observed drug screens per week; actively participate in and follow all treatment recommendations; and remain sober and drug free.

[¶42] Neither parent participated in a substance abuse treatment evaluation within one month of the April 2018 case plan filing. It took them nearly two years to do so as part of their clinical assessments. For approximately 21 months, from January 2018 to October 2019, Mother's and Father's drug testing compliance was hit and miss—they would test for a while and then stop.[8] They each missed dozens of testing dates in 2018.

[¶43] Though Mother was sober for the 10 months leading up to and including trial, she admitted to using methamphetamine for 20 years, including while JL was in her custody. She had attended three substance abuse programs over the years but did not consider any of them successful.

[¶44] Father was not forthcoming about his drug use. On his clinical assessment he reported that he last used a controlled substance five to seven years ago, and only cannabis. The Department reasonably questioned this given his positive test for THC in January 2018 and his criminal record, *see infra* ¶ 50. The district court decided Father's testimony was not credible to the extent he claimed he did not use controlled substances between January 2018 and Fall 2019. *See In re AD*, ¶ 30, 151 P.3d at 1109 ("It was within the district court's province to weigh the evidence and judge the credibility of the witnesses." (citation omitted)).

[¶45] Ms. Batista testified that after Father missed several drug tests between November 2019 and February 2020, she asked him to submit to a hair follicle test. He agreed but then cut his hair and did not complete the test. He submitted to a hair follicle test in March, which was negative for all substances. Father denied cutting his hair after Ms. Batista asked him to submit to a hair follicle test.

[¶46] Although Ms. Batista was proud of Mother and Father for their current sobriety, she expressed concern because, historically, they had not been able to maintain sobriety long term. If they relapsed it could put JL in unsafe situations, both physically and emotionally.

---

[8] Mother's history of positive drug tests and inconsistent drug testing dated back to 2015.

10

[¶47] The case plans required that Mother and Father take the following steps to eliminate criminal activity: have no further arrests or criminal activity; resolve any outstanding warrants; comply with all probation/parole terms; attend all necessary court hearings; and demonstrate a lifestyle free from criminal activity.

[¶48] Neither parent began demonstrating a lifestyle free from criminal activity until Fall 2019. Some of Mother's criminal history related to what she characterized as her "really bad habit of driving when I'm not supposed to[,]" but her more recent criminal history related to drugs. In July 2019 she was arrested for possession of methamphetamine and THC. She pleaded guilty to one charge and the court sentenced her to 60 days in jail. In early September 2019 she was charged with felony possession of methamphetamine after someone found methamphetamine in the jail cell she shared with another individual. She was released on bond in November 2019, pending trial in October 2020.

[¶49] Father's criminal history related to drugs. In January 2006, he was charged with one count of misdemeanor marijuana possession and one count of misdemeanor methamphetamine possession. He pleaded guilty to two counts of possession, was convicted, and received a suspended sentence. Shortly after, he admitted to a probation violation.

[¶50] More recently, in June 2019, Father received a citation for misdemeanor methamphetamine possession after a drug dog alerted on his car and the officer found a small tin with methamphetamine residue behind the center console. He pleaded guilty to possession, was convicted, and the court sentenced him to 60 days, suspended. The following month the court revoked his probation after he was found in possession of a controlled substance, and he was convicted of interference with a police officer after he gave police the wrong name.

[¶51] Finally, the case plans required that Mother and Father take the following steps to adequately provide for JL's needs: obtain financial stability within three months of the case plan filing; provide the Department verification from the employer or financial assistance program; provide adequate food, clothing, and shelter at all times; pay all bills on time; and report all employment changes to the Department within 72 hours.

[¶52] The family had a history of unemployment. The parents did not obtain financial stability within three months of the case plan filing. Ms. Batista had difficulty obtaining employment verification from Father at times, and Mother had not worked since 2010 for various reasons. Neither Mother nor Father had provided JL any financial support since the Department took her into custody in January 2018. Father told Ms. Batista he had hundreds of thousands of dollars in medical debt and when he received medical bills in the mail he sent them back as undeliverable because he could not pay them. Most notably,

despite their tenuous financial stability, the parents did not apply for services and benefits that may have been available through the Department to help them.[9]

**JL's Needs**

[¶53]   JL does not have significant mental health needs.  But she does have an adjustment disorder and she needs stability and consistency.  The record supports that both parents failed to provide JL stability and consistency when they had the opportunity, particularly with respect to visitation.

[¶54]   Tara Rios Vega, JL's therapist from May 2018 through trial, diagnosed JL with an adjustment disorder—"a diagnosis that is given for someone who is going through any issues that are nontypical."  For JL "it was the issue of not being in the genetic family's home."[10]  As part of JL's initial treatment, the parents were allowed bi-weekly supervised visits with four primary rules: (1) no gifts unless for a holiday or birthday; (2) no time alone with the child; (3) no inappropriate comments; and (4) no promises the child can come home.  Ms. Vega supervised four visits which one or both parents attended.  At times, Mother made inappropriate comments and Ms. Vega had to intervene.  Other times, the parents provided JL gifts and Ms. Vega had to remind them of the rules.

[¶55]   In September 2018, Ms. Vega recommended stopping visitation because the parents missed many visits and the inconsistency negatively affected JL, causing her to become discontent, let down, and disappointed.  After suspending visits, JL became more content and asked less about her parents.  The issues addressed in therapy became more typical for

---

[9] Ms. Batista testified that she provided Mother and Father a list of available services several times.  She also testified about instances she tried to help the parents address their financial situation.

For example, in Summer 2019, Mother told Ms. Batista that she had no money and was resorting to "dumpster diving" for food.  Ms. Batista offered to help Mother find a job when she was released from jail.  Ms. Batista also talked to Mother about the various benefits that she could apply for, such as food stamps.  Later that summer, Mother stopped by the Department's office and talked to Ms. Batista about starting to work on her case plan.  Ms. Batista gave Mother a list of resources and reminded Mother that she could apply for benefits at the Department lobby.  Ms. Batista recommended that Mother schedule a benefits appointment before leaving that day but Mother did not do so.

In January 2020, Ms. Batista met with Mother and Father at the Department's office.  When Mother and Father told her they were struggling to feed themselves and pay their bills, she reminded them about benefits that were available through the Department and told them they needed to schedule an appointment with a benefits worker.  During the meeting, one of the parents (she could not recall which) filled out a benefits application and said they would turn it in and schedule an appointment before leaving.  However, Mother and Father left without doing so.

[10] Mother and Father both seem to blame JL's adjustment disorder on the Department.  However, they fail to acknowledge the role Mother's drug use and their warrants played in JL's initial removal from the home, and the role failure to follow their case plans played in JL's continued removal from the home.

12

JL's age. As JL progressed, the need for therapy tapered off. Ms. Vega last saw JL in April 2020, and JL was adjusting well to the Texas move.

[¶56] According to Ms. Vega, JL functions well in a stable, structured environment. In such an environment, JL had the ability to advocate for herself and utilize her resources—she did not have to worry about "what-ifs." If JL were removed from a stable, structured environment they "might see some decompensation[,]" meaning JL's progress "would probably deteriorate or decrease." To Ms. Vega's knowledge, the only trauma JL had been exposed to was instability. Lack of permanent placement affected JL in that she never knew what was coming. Not knowing who she would live with long term caused JL anxiety.

[¶57] Ms. Batista added that if JL returned to Mother and Father she would likely have to restart weekly therapy. There were also concerns that instability in the home could cause JL to develop an attachment disorder.

### Inconsistent Contact

[¶58] Mother and Father continued to have inconsistent contact with JL, to her detriment, after formal visitation stopped. For example, in March 2019, the foster parents agreed to meet Mother and Father at a restaurant for a visit with JL, but the visit had to be cut short because Mother and Father appeared to be under the influence of some substance. After that failed visit, the foster parents agreed to try phone calls between JL and Father. The first call went well, but then Father made promises he could not keep. He talked to her about coming home and told her he would call the next day but did not. The foster parents ended the phone calls because JL regressed when they did not occur. She defied the rules, did not listen, and was in a very negative mood. JL told Ms. Batista that she felt like her parents did not love her when they missed visits.

[¶59] In November 2019, Father asked the Department for visitation and Ms. Batista consulted JL's therapist, who advised that visitation with either parent would be detrimental to JL. At that point, it had been roughly eight months since Father had seen JL and seven months since he had talked to her. The previous contacts had not gone well and Ms. Batista remained concerned the contact would be inconsistent and negatively affect JL.

[¶60] After JL moved to Texas in April 2020, Ms. Batista approved Mother and Father sending JL letters, but they sent her only two leading up to trial. They sent the first letter in April. JL intended to respond but never finished and her foster parents did not want to force her to respond if she did not want to. They sent the second letter in June—on the same day they informed the court they were writing letters. They did not write JL any more letters but continued demanding visits.

13

[¶61]   Viewing this evidence in the Department's favor, it is clear each parent made modest progress on their respective case plans and their efforts came late in the process—nearly two years into JL's case and after nearly five years of Department involvement with their family.  And though we agree with Father that in a termination case against both parents, evidence about one parent should not be held against the other, the evidence in this case supported termination of each parent's rights for similar reasons.  Mother's and Father's mental health, substance abuse, and criminal activity are clearly intertwined, making treatment all the more important to their ability to safely parent JL and making it all the more troublesome that they did not do more to address the case plan requirements on mental health and substance abuse in the 10 months they were sober.  The district court could conclude from the Department's evidence about Mother's and Father's mental health diagnoses with limited treatment, history of substance abuse with recent sobriety and limited treatment, drug-related criminal activity, inconsistent visitation and contact with JL, inconsistent housing, and failure to apply for the services and benefits that may have been available to help them financially, that the Department established by clear and convincing evidence that Mother and Father are "unfit to have custody and control of" JL.

[¶62]   This is a classic case where the evidence demonstrates that the child's best interests diverge from the fundamental rights of the parents.

> In similar circumstances, we have said: " 'When the rights of a parent and the rights of a child are on a collision course, the rights of the parent must yield.' " *SD v. Carbon County Dep't of Family Servs.*, 2002 WY 168, ¶ 27, 57 P.3d 1235, 1241 (Wyo. 2002), quoting *Matter of MLM*, 682 P.2d 982, 990 (Wyo. 1984).  While parents have a fundamental right to raise their children, children have a right to stability and permanency in their family relationships.  Section 14-2-309(a) recognizes there must be limits on the amount of time [the Department] will attempt to rehabilitate a parent while the children remain in foster care.  The time limits recognize that the children's right to stability and permanency is superior to the parent's right to familial association.

*In re AD*, ¶ 31, 151 P.3d at 1109–10.

[¶63]There is no question that, as the termination trial approached, Mother and Father made greater efforts to rehabilitate themselves.  We hope they continue those efforts.  But they did not make sufficient progress within a reasonable time.[11]  By trial, JL had been placed

---

[11] There is little question that Mother, in particular, suffers from addiction.  We recognize the layer of complexity addiction adds to neglect and termination proceedings.  *See, e.g.*, *In re R.J.F.*, 2019 MT 113, 395 Mont. 454, 443 P.3d 387 (discussing addiction in the context of reasonable efforts and termination of parental rights).  On one hand, the fact that "addiction often involves cycles of relapse and remission"

out of the home for nearly two and a half years.  For 18 months Mother and Father did not comply at all with Department requirements to be reunified with JL, and their efforts were incomplete in the 10 months leading up to trial.  At trial, the court had no clear indication of when, if ever, Mother and Father would be sufficiently rehabilitated to provide JL with the stability necessary to allow reunification.  Under these circumstances, the evidence supports the district court's decision to terminate Mother's and Father's parental rights.

## *CONCLUSION*

[¶64] The district court had jurisdiction over the termination proceedings.  The Department presented sufficient evidence for the district court to terminate Mother's and Father's parental rights under Wyo. Stat. Ann. § 14-2-309(a)(v).  We therefore affirm.[12]

---

should "better inform[] the treatment and services a person with a substance use disorder needs to address the problem." *Id.* ¶ 44 n.14.  On the other, it "does not excuse behaviors of relapse or one's obligation to seek and participate in treatment[.]" *Id.*

[12] Our affirmance does not rely on, and in fact we discount, certain of the Department's evidentiary arguments.  For example, at times the Department's emphasis on the parents' limited income ran afoul of our recognition that "[m]any families live in poverty and require state assistance to provide for the necessities of life.  This does not make the parents unfit.  It defines them as being poor and under our laws being poor is not *per se* an element of neglect." *State of Wyo., Dep't of Family Servs. v. TWE (In re ATE)*, 2009 WY 155, ¶ 24, 222 P.3d 142, 148 (Wyo. 2009).  The pertinent problem related to finances in this case was not the parents' limited income, but their repeated failure to apply for the services and benefits that may have been available through the Department to help them.  Moreover, we found no support in the record linking JL's unhealthy weight when she was taken into protective custody, and subsequent weight loss after she entered foster care, to anything Mother or Father did or did not do related to her health, such as nutrition and exercise.

**KAUTZ, Justice,** specially concurring.

[¶65]   I concur in the majority opinion except footnote 1.  That footnote addresses an issue not raised by the parties and is unnecessary for this decision.  Furthermore, it mentions a special concurrence from *In re BAD*, 2019 WY 83, 446 P.3d 222 (Wyo. 2019).  The majority opinion in that case, not the special concurrence, is the current law on this extraneous issue.